## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ALLAN L. REAGAN, | § | CASE NO. 20-11161-tmd |
| | § | |
| Debtor | § | CHAPTER 11 |

## DEBTOR-IN-POSSESSION'S FIRST AMENDED PROPOSED PLAN OF REORGANIZATION

Allan L. Reagan, the Debtor-in-Possession, ("**Debtor**") hereby submits to his Creditors, as proponent, his First Amended proposed Plan of Reorganization ("**Plan**") pursuant to Chapter 11 of Title 11, United States Code (hereinafter the "**Bankruptcy Code**" or "**Code**").

## ARTICLE I

## DEFINITIONS

Except as otherwise indicated, the terms used in this Plan have the definitions used in the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court and the United States District Court for the Western District of Texas (the "**Local Rules**"). In addition, the following terms shall have the following meanings:

1.01. **Allowed Claims** shall mean a claim:

(a) with respect to which a proof of claim has been filed with the Court within the applicable period of limitation fixed by the Federal Rules of Bankruptcy Procedure, Rule 3003, in a liquidated non-contingent amount as to which no objection has been Filed by Debtor prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date; or

(b)       scheduled in the list of Creditors prepared and filed with the Court pursuant to Federal Rules of Bankruptcy Procedure, Rule 1007(b) and is not listed as disputed, contingent, or unliquidated as to amount in the schedules or this plan, and

(c)       in either case as to (a) and (b), as to which no objection to the allowance thereof has been filed within any applicable period of limitation fixed by Federal Rules of Bankruptcy Procedure, Rule 3007, this Plan or an order of the Court, or as to which any such objection has been determined by a final order or judgment which is no longer subject to appeal and as to which no appeal is pending. An Allowed Claim shall not include unmatured or post-petition interest unless otherwise stated hereafter in the Plan.

1.02.   **Allowed Secured Claim** shall mean an Allowed Claim secured by a lien, security interest, mortgage or other interest in property in which the Debtor has an interest, or which is subject to set-off under § 553 of the Code, to the extent of the value of such property securing the Allowed Secured Claim pursuant to § 506(a) of the Code or to the extent the amount is subject to said set-off as the case may be. An Allowed Secured Claim may include post-petition interest if permitted under § 506 of the Code.

1.03.   **Confirmation Date** shall mean the date upon which the Order of Confirmation is entered by the Court.

1.04.   **Court or Bankruptcy Court** shall mean the United States Bankruptcy Court for the Western District of Texas in which the Debtor's Chapter 11 case is pending or the United States District Court for the Western District of Texas together with any court having competent jurisdiction to hear appeals from either the Bankruptcy Court or the United States District Court.

1.05.   **Debtor** shall mean Allan L. Reagan, the Debtor-in-Possession and proponent of this Plan of Reorganization.

1.06.    **Effective Date** shall mean fifteen (15) days from the Confirmation Date.

1.07.    **Order of Confirmation** shall mean the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

1.08.    **Plan** shall mean this Chapter 11 Plan of Reorganization, including any modification, amendments or supplements thereto.

1.09.    **Term of the Plan** shall mean that period after the Effective Date during which payments are being made to Creditors.

1.10.    **Payment Due Date** shall mean the day of month that quarterly payments to Creditors are due under the Plan, which shall be the fifteenth (15th) day of the month following the Effective Date and continuing on the same day every three months thereafter.

1.11.    **Administrative Expense** shall mean those claims entitled to priority under § 507(a)(1), § 503(b) and § 330 of the Code, which include attorney's fees and expenses to the attorneys for Debtor, and shall include, without limitation, any actual and necessary expenses of preserving the Estate of the Debtor, any actual and necessary expenses of operating the business of the Debtor, any fees for Trustee and professionals employed by Trustee, and any indebtedness or obligations incurred or assumed by the Debtor in connection with his conduct of the business of Debtor, or for the acquisition or lease of property or for the obtaining of services to the Debtor, all allowances of compensation or reimbursement of expenses to the extent allowed by the Court under the Code and any fees or charges assessed against the Estate of the Debtor under Chapter 123, Title 28, United States Code.

1.12.    **The Code or the Bankruptcy Code** shall mean the United States Bankruptcy Code as contained in 11 U.S.C. § 101, et seq., and all amendments thereto.

1.13.    **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure, as amended and any reference to a Bankruptcy Rule shall refer to the rules of procedure set forth therein.

1.14.    **Chapter 11 Case** shall mean the above referenced and captioned Chapter 11 proceeding.

1.15.    **Creditor** shall mean any party or entity having a claim against the Debtor, including but not limited to the following: Priority Creditors, Secured Creditors, Trade Creditors and Unsecured Creditors, as herein defined.

1.16.    **Estate** shall mean the estate created by § 541 of the Bankruptcy Code.

1.17.    **Pro Rata** shall mean the proportion that any Allowed Claim in any class bears to the aggregate amount of all Allowed Claims in such class.

1.18.    **Unimpaired Claim** shall mean any claim or any class of claims that are not Impaired under the Plan. The term **Impaired** as used in this definition refers to and is governed by the language of § 1124 of the Code.

1.19.    **Unsecured Claim** shall mean any Allowed Claim against the Debtor (such claim being a claim against the Debtor's Excluded; separate; and/or separately managed property) for which the holder has no security for the repayment thereof or the portion of an Allowed Secured Claim for which the security held by the holder of that claim is insufficient to fully satisfy the claim. This category includes all claims deemed unsecured pursuant to § 506(a) of the Code.

**ARTICLE II**

**DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS
DEBTOR'S ESTATE**

2.01.    Debtor's business has, for many years, involved making investments in real estate, startup ventures and marketable securities, as well as managing certain operating businesses.

Additionally, Debtor is the founder, CEO and a principal owner of the "Flix Brewhouse" branded dine-in movie theater chain ("**Flix**"), which, as of the Petition Date, consisted of ten theaters that had opened and operated for some period of time during 2020 and one under construction.  Flix began operations in June 2011, and, prior to the onset of the COVID-19 pandemic, was a successful movie theater operation that was concluding an expansion phase.  Initially, in mid-March 2020, all of the Flix theaters (and most movie theaters in the USA) were temporarily closed under a variety of government orders generally intended to "flatten the curve." Concurrently, the major movie studios postponed scheduled feature films or distributed the films through pay-per-view or streaming subscription channels. Both the Debtor and the movie theater industry in general then believed that the effects of the pandemic would ease by Summer, and the feature "Tenet" was rescheduled to release July 7. However, especially after Memorial Day social gatherings, COVID-19 infection, hospitalization and death rates once again spiked, and the major movie studios continued to delay movie releases.  "Tenet" was rescheduled for early September, and the industry adopted a series of protocols called CinemaSafe, designed to welcome back movie-goers. In each reopened auditorium, Flix installed a costly air purification and pathogen-neutralizing system called cold plasma bi-polar ionization.  Despite all these efforts, the restart of the movie theater industry was not successful. "Tenet" woefully underperformed expectations and the studios continued to remove films from exclusive theatrical release. In early October, Regal closed all 536 of its USA theaters. With the exception of two theaters unable to reopen due to government restrictions, Flix attempted to operate at cash break-even prior to rent expense and debt service, but was unable to do so, depleting its liquid reserves as a result.  The combination of the pandemic and the lack of any new releases resulted in an almost negligible revenue stream, and between mid-October and early November 2020 Flix closed all eight reopened theaters for an indefinite period.

As of the date of this Amended Plan approximately 53%  of the movie theaters in North America are likewise indefinitely closed. Flix, which once employed over 1,200, now has five full-time equivalent employees.  Other cinema eatery chains, including CMX, Studio Movie Grill and most recently Alamo Drafthouse, have filed for Chapter 11 protection.

2.02.    As discussed above, in addition to Flix, Debtor has historically made investments in real estate, start-up companies, and marketable securities.  One of the real estate investments, made through 3401 Hoteliers LP ("Hoteliers"), was a Wyndham Garden Hotel in Austin, Texas. Similar to Flix, with the onset of the pandemic, the revenues from that hotel disappeared. Hoteliers obtained a so-called "PPP" loan but once those funds were exhausted, and Hoteliers was unsuccessful after months of effort to obtain a debt forbearance, the hotel was closed on October 18, 2020.   The secured lender for that property, Wells Fargo (as agent), obtained appointment of a receiver for the property on December 14, 2020 and, along with Hoteliers, has been attempting to market the property. A tentative buyer has been identified, but no contract signed as of the date of this Amended Plan. Were the tentative transaction to close it is unlikely that Hoteliers would receive any proceeds distributable to its owners.

2.03.    The Debtor is also the principal of Aramcor Inc., which provides management services for the Debtor's real estate holdings and related entities.  Aramcor has, in the past, paid the Debtor a monthly gross salary of $96,000, which included services provided to Flix.  During 2020, Debtor briefly went on the Flix payroll when it was resuming operations, but after the most recent closure Debtor's salary from Flix has been eliminated, pending the return of Flix's ability to pay.

2.04.    Debtor's other principal business interests include partial ownership and control of the following (list is not complete of all business interests; readers are encouraged to review the Schedules filed in this case and the Liquidation Analysis attached as Exhibit B):

− Southwestern Retail Properties, L.P., which owns the shop space within the Sky Ridge Plaza shopping center in Round Rock, Texas.

− Southwestern Retail Properties II, LP, which owns the anchor space in Sky Ridge Plaza, of which approximately 70% is leased to the Round Rock, Texas Flix Brewhouse.

− Southwestern Retail Properties, III, LP which owns the single-tenant land and building on which the brand new (opened February 2020) Flix Brewhouse in San Antonio, Texas is located.

− Round Rock Business Park, LP, which owns the Park West Corporate Center in Round Rock, Texas.

− Prairie Pointe Estates, Inc., which owns a tract of land being  developed as a residential subdivision in Burnet County, Texas.

−100 Trinity LLC, which is a private investment entity that has made a variety of both specialty loans and conventional investments since 2008.

− as reflected on the Debtor's schedules, Debtor has small minority investments in certain other entities, including Newser, Inc. and First Stop Health.

2.05.    The Debtor has executed guaranty agreements, for certain lease obligations and loans, as set forth more fully in the Debtor's schedules.  The combined pressures of the loss of revenue to Flix, diminished receipts for the shopping center entities, loss of income from the hotel property, declared defaults under various loans and leases and creditor pressures regarding the ripening contingent guaranty liabilities resulted in the need for the Debtor to file this case.

## BANKRUPTCY

2.06.    On October 22, 2020 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code, which commenced the Chapter 11 Case titled *In Re: Allan L. Reagan* and currently pending before this Court and assigned case number 20-11161 case (the "**Chapter 11 Case**"), the lead case for this adversary proceeding. Debtor continues to manage and operate his business as a debtor-in-possession pursuant to Bankruptcy Code § § 1107 and 1108. On October 27, 2020, Michael Colvard was appointed Subchapter V trustee.

## DEBTOR'S PLAN

2.07.    The Debtor's plan payment analysis is attached as Exhibit "A."  Essentially, the plan provides for payment of the Debtor's disposable income over a 5-year period.  The plan payments total $3,110,935, which escalate from year 1 through 5 given reasonably foreseeable expected improvement in economic conditions.   The Debtor will liquidate approximately $225,000 of marketable securities within ten days of the Effective Date, which is included in the Plan payments for Year 1 and is not a separate distribution; this is community property and, therefore, 50% will be the property of Jan Reagan, Debtor's non-filing spouse and 50% will be paid to holders of Allowed Claims.  Although not anticipated, in the event that Hoteliers makes any further distributions to Debtor, his 50% share will be contributed as additional Plan payments for the quarter(s) in which received.  Because his income is not based a regularly monthly cash flow, the Debtor proposes making the pro-rata payments on a quarterly basis.  The percentage distribution to creditors is not certain, given that (1) the proof of claim deadline has not passed and (2) certain of the claims are likely to be the subject of an objection and allowance or estimation

process.[1]  Attached as **Exhibit "C"** is the current listing of claims filed and scheduled; Debtor believes several of the claims are subject to objection.  In particular, certain of the underlying claims on which a guaranty exists are being paid, and others include amounts which are not recoverable under the guaranty and/or the underlying obligation.

## ARTICLE III

## MEANS OF IMPLEMENTATION AND ABILITY TO MAKE PLAN PAYMENTS

3.01.  The means necessary for the execution of the Debtor's Plan includes the continuation of the Debtor's business with the exception of the Wyndham Garden Hotel.

3.02.  Continuation of the Debtor's Business. The Debtor, as reorganized, will retain all property of the Estate except for the marketable securities to be liquidated on the Effective Date. The retained property, excepting the Wyndham Garden, shall be used and employed by the Debtor in the continuance of his business. The Debtor shall fund the Plan payments to Creditors from cash flow that he receives from his future business operations and earnings from existing assets as stated in the Plan.  Payments are based on the projected disposable income as set forth in Exhibit "A, " which includes all community income.  Janet, Reagan, the Debtor's non-filing spouse, has persisting medical issues relating to a diagnosis of cervical spondylosis and stenosis with myelopathy.  These issues prevent her from performing normal chores and functional activities. As a result, the projected monthly household expenses include reasonable sums for her medical, domestic and household assistance.

3.03.  Advance Payment of Claims. Debtor may make advance payments on claims in Debtor's business judgment and discretion but must stay current on payments to all other creditors pursuant to the Plan.

---

[1] Certain creditors have claims directly against entities that have debt obligations to those creditors which were the subject of the Debtor's guaranty agreements, and may have recoveries directly from those entities.

3.04.    Consensual post-confirmation modification of plan terms. Notwithstanding any provision set forth in this Plan, the Debtor and any particular Creditor provided for in this Plan may enter into any agreement(s) after confirmation which modifies that Creditor's treatment and payment terms, so long as such agreement is reduced to writing and signed by the Debtor's and consenting Creditor's authorized representatives and does not provide for treatment which provides a pro rata recovery under this Plan better than the creditors in the same class. In such event, any modified agreement shall be deemed to supersede the terms of this Plan.

3.05.    If and to the extent necessary to fund Plan payments in the event of a deficit in cash flow and investment earnings, the Debtor will liquidate investments.

3.06.    Payments by Trustee in the event of confirmation pursuant to 11 U.S.C. §1191(b). In the event of confirmation under Section 1191(b), Trustee will act as disbursing agent and Debtor shall remit the plan payments reflected on Exhibit A to the Trustee on a quarterly basis for distribution to creditors.  Trustee will receive compensation of $750.00 per quarter (or such other amount as agreed to by the Debtor and Trustee or as billed and allowed by the Court subject to the standards imposed by the Bankruptcy Code) for acting as disbursing agent, to be deducted from Plan payments prior to disbursement.

3.07.    As noted above, to the extent of recoveries realized on account of the Hoteliers interest, Debtor's 50% share of such proceeds will be contributed to the Plan.  Additionally, in the event the governing board of an entity in which Debtor has an ownership interest declares an investor distribution (other than a so-called tax distribution) at a time when such entity is in undisputed default  beyond applicable cure periods of an obligation that is also the subject matter of an unsatisfied Allowed Claim in this case, Debtor shall make good faith efforts to refuse such

distribution until the related default is cured, and if unable to do so, shall contribute this amount to Plan payments.

**ARTICLE IV**

**LIQUIDATION ANALYSIS**

4.01.   To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached to the Plan as **Exhibit B**.   As set forth, the Plan payments at present value clearly exceed the expected proceeds from liquidation of assets.

**ARTICLE V**

**UNCLASSIFIED CLAIMS**

5.01.   **Administrative Expenses**. The administrative expenses of the Debtor's Chapter 11 case allowed pursuant to § 503(b) of the Code and given priority pursuant to § 507(a)(1) of the code shall be paid the full amount of their Allowed Claim(s) on the Effective Date or upon entry of an order allowing the administrative expense or as agreed to between the Debtor and holder of such claim. The deadline for filing a claim for an administrative expense including all professional fee applications shall be 30 days from the date of entry of the confirmation order. The estimated Administrative Claims are those which will be owed to Debtor's counsel and to Debtor's financial advisor, HMP Advisory Holdings, LLC dba Harney Partners, and any owed to the Subchapter V Trustee.

5.02.   **Priority Tax Claims**. Debtor is not aware of any threatened or asserted Priority Tax Claims.  To the extent they exist, pre-petition claims held by governmental units of the type described in §507(a)(8) of the Bankruptcy Code will be paid in full, with interest at an annual rate

of 12% in equal monthly installments over a period beginning 30 days after the Effective Date of the Plan and ending five years after the date of the filing of the petition. Notwithstanding the foregoing treatment, any holder of a §507(a)(8) claim may file a written election to be treated on the same basis as any nonpriority unsecured claim. Any such election must be filed in writing not later than 14 days after entry of the order confirming the plan.

## ARTICLE VI

## CLASSIFICATION OF CLAIMS

6.01.   **Class 1**: The Allowed Secured Claims of Ford Motor Credit and Wells Fargo Auto Finance.

6.02    **Class 2**:  The Allowed Secured Claim of Interactive Brokers, LLC

6.02.   **Class 3**:   All Allowed Unsecured Claims of creditors with claims against the Debtor.

6.03.   **Class 4:** Allowed Claims of Insiders or Affiliates.


## ARTICLE VII

## TREATMENT OF CLAIMS

7.01.   **Class 1: Unimpaired**. The Allowed Secured Claims of Ford Motor Credit and Wells Fargo Auto Finance will be paid in full according to the terms of the financing agreement, and the creditor shall retain its lien.

7.02.   **Class 2**.  Unimpaired.  The Allowed Secured Claim of Interactive Brokers, LLC will be paid in full according to its terms and the creditor shall retain its lien.

7.03.   **Class 3: Impaired**. All Allowed Unsecured Claims shall receive their pro rata share of Plan Payments.

7.04.   **Class 4: Impaired**. No Insiders or Affiliates shall receive Plan Payments.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.01.   All executory contracts or unexpired leases, not otherwise assumed or rejected by the Debtor prior to confirmation of the Plan, are rejected by the Debtor under the Plan as of the Effective Date, except as otherwise provided under Treatment of Claims in the Plan.  Debtor will file a list of contracts to be assumed prior to the confirmation hearing.

8.02.   A proof of a claim arising from the rejection of an executory contract or unexpired lease must be filed no later than thirty (30) days after the date of the order confirming this Plan.

## ARTICLE IX

## PROCEDURE FOR RESOLVING CONTESTED CLAIMS

9.01.   **Filing Objections**. Debtor shall be responsible for preparing, filing and prosecuting objections to claims or motion(s) to estimate claims for allowance. Objections to claims may be filed with the Bankruptcy Court and served upon each holder of the claims to which objections are filed not later than ninety (90) days after the Confirmation Date, unless such time period is extended by order of the Court. No distribution will be made on account of a disputed claim unless such claim is allowed.

9.02.   **Prosecution of Objections**. The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**9.03    Payments by Third Parties**.   Any Claim will be deemed reduced and/or disallowed, as applicable, without a claim objection having to be filed by the Debtor and without any further notice, action or order of the Bankruptcy Court, to the extent that the holder of such

Claim (a) receives payment in full or part (as applicable) on account of such Claim from a person or entity which is not the Debtor (b) receives a written notice of such proposed reduction or disallowance from the Debtor in accordance with the provisions of this paragraph, and does not object in writing to the proposed reduction or disallowance set forth in such notice within twenty (21) days from service of such notice. To the extent a Holder of a Claim receives, on account of such Claim, both a distribution under the Plan and a payment from a person or entity that is not the Debtor on account of such Claim, the Debtor may serve a notice of such duplicative payment and such Holder must, within 21 days of receipt thereof, either (a) repay or return the distribution received under the Plan to Debtor, but only to the extent that the Holder of such Claim received payment on account of such Claim in an amount greater than the total amount that the holder of such Claim was owed on account of such Claim (for purposes of this provision, the total amount owed on account of such Claim shall be without regard to any limitations in the Bankruptcy Code and/or statutory cap, such as, for example, the cap provided for under section 502(b)(6) of the Bankruptcy Code), or (b) file and serve on the Debtor an objection setting forth the basis upon which the Holder of such Claim should not be required to return the amounts set forth in the notice received by such Holder. This Section 9.03 shall not limit, reduce, alter or otherwise modify in any way any obligations of any non-Debtor obligor or guarantor with respect to any payment assurances arising under or relating to executory contracts and unexpired leases, whether or not rejected by Debtor in accordance with Section 8.01 of this Plan.

# ARTICLE X

## MISCELLANEOUS PROVISIONS

10.01. **Vesting of Assets**: On the Effective Date, title to all assets and properties dealt with by the Plan shall vest in Reorganized Debtor, free and clear of all Claims and Interests other than any contractual secured claims granted under any lending agreement, on the condition that Reorganized Debtor complies with the terms of the Plan, including the making of all payments to creditors provided for in such Plan. If Reorganized Debtor defaults in performing under the provisions of this Plan and this case is converted to a case under chapter 7, all property vested in Reorganized Debtor and all subsequently acquired property owned as of or after the conversion date shall re-vest and constitute property of the bankruptcy estate in the converted case.

10.02. **Retention of Jurisdiction**: Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a) allow, disallow, determine, subordinate, litigate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest (whether filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Administrative Expense Claim or Priority Claim, the resolution of any Objections to the allowance or priority of Claims or Equity Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Equity Interest to the extent permitted under applicable law;

(b) grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan;

(c) hear and determine any and all adversary proceedings (including the Declaratory Action), motions, applications, and contested or litigated matters, including, but not

limited to, all causes of action, and consider and act upon the compromise and settlement of any Claim, or cause of action;

(d)    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtor is or was a party, or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)    ensure that all distributions to holders of Allowed Claims under this Plan and the performance of the provisions of this Plan are accomplished as provided herein and resolve any issues relating to distributions to holders of Allowed Claims pursuant to the provisions of this Plan;

(f)    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with Section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of this Plan and all contracts, instruments, releases, other agreements or documents created in connection with this Plan, including, without limitation, the Confirmation Order, for the maintenance of the integrity of this Plan in accordance with Sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

(g)    determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of this Plan (and all exhibits and schedules to this Plan) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by this Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(h)    modify this Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or modify the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan, to the extent authorized by the Bankruptcy Code and this Plan;

(i)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

(j)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)     determine any other matters that may arise in connection with or relating to this Plan and the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order;

(l)     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(n)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(o)     determine and resolve controversies related to the Estate or the Debtor from and after the Effective Date;

(p)     hear and determine any other matter relating to this Plan; and

(q)     enter a final decree closing this Chapter 11 Case.

10.03.  **Adversary Proceedings** and Retained Claims: The Debtor reserves the right to begin or continue any adversary proceedings permitted under Title 11, United States Code and the applicable Federal Rules of Bankruptcy Procedure.  Debtor reserves all claims against any party, including but not limited to preference actions under Section 547 of the Bankruptcy Code, fraudulent conveyance claims under Section 548 of the Bankruptcy Code and applicable state law (including Uniform Fraudulent Conveyance Act claims), setoff and recoupment rights, and federal and state law causes of action

10.04.  **Valuation of Secured Claims**: All Secured Claims shall be allowed in an amount as agreed to by the Debtor and the Creditor holding the Secured Claim, as provided by this Plan, or as ordered by the Court pursuant to § 506. The Court shall not be required to determine the amount of a Secured Claim unless a motion to require such determination is filed at least ten (10) days prior to the first hearing on confirmation by the Debtor or other party in interest. In the event that such a Motion is not filed, the value of the property as set forth in this Plan shall be deemed

as the court's finding as to valuation, and, if no value is set forth in this Plan for property against which a Creditor claims a lien, or if such Creditor's claim is treated as unsecured in this Plan, then such Creditor's claim shall be deemed an Unsecured Claim.

10.05. **Modification of Plan**: This Plan may be modified or corrected upon motion of the Debtor pursuant to § 1193 (a) prior to Confirmation. Modifications or corrections may be made without additional disclosure provided that the Court finds that the modifications or corrections do not adversely affect any Claim or Interest or classes of Claims or Interests. After the Confirmation Date, the Debtor, upon order of the Court and in accordance with § 1193(b) may remedy any defect or omission or reconcile any inconsistencies in the Plan in such a manner as may be necessary to carry out the purposes and intent of the Plan.

## ARTICLE XI

## DISCHARGE AND OTHER EFFECTS OF CONFIRMATION

11.01. **Discharge**. If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6). If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first five years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt: (i) on which the last payment is due after the first five years of the Plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

11.02. **Tax Liens**. Tax liens, if any, survive the plan confirmation, a bankruptcy discharge, and dismissal of the case. The liens continue to be enforceable against the Reorganized Debtor's property to the extent, priority, and validity such liens were entitled to as of the Petition Date and under federal law.

11.03. **Plan Creates New Obligations**. The obligations to creditors that the Debtor undertakes in the Confirmed Plan replace those obligations to creditors that existed prior to the Effective Date of the Plan. The Debtor's obligations under the Confirmed Plan constitute a binding contractual promise that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under Texas law. To the extent a creditor retains a lien under the Plan, that creditor retains all rights provided by such lien under applicable non-Bankruptcy law.

11.04. **Legally Binding Effect**. The provisions of this Plan shall bind all Creditors and Interest Holders, whether or not they accept this Plan. On and after the Effective Date, all holders of Claims shall be precluded and forever enjoined from asserting any (i) Claim against the Debtor based on any transaction or other activity of any kind that occurred prior to the Confirmation Date, except as permitted under the Plan.

11.05. **Injunction**. The entry of the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending Legal Proceedings, if any, against the Debtor and his assets and properties and any proceedings not yet instituted against the Debtor or his assets, except as otherwise provided in the Plan. Except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, may have held, hold, or may hold Claims against the Debtor are permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor or his property, with respect to any such Claim, (b) the enforcement, attachment, collection

or recovery by any manner or means of any judgment, award, decree or order with respect to any such Claim against the Debtor or his property, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or his property, with respect to such Claim, (d) asserting any right of subrogation of any kind against any obligation due to the Debtor or the property of the Debtor or the Estate with respect to any such Claim and (e) asserting any right of setoff or recoupment against the Debtor or the Estate except as specifically permitted by §553 of the Bankruptcy Code. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in these cases pursuant to §105, if any, or §362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date.

## ARTICLE XII

## DEFAULT

12.01.  In the event of a non-monetary or monetary default by the Debtor under the Plan, the affected Creditor shall provide written notice of such default to:

>       Allan L. Reagan
>       2000 S. Interstate Hwy 35, Ste Q11
>       Round Rock, Texas 78681-6942
>
>       AND
>
>       Mark C. Taylor
>       Waller Lansden Dortch & Davis, LLP
>       100 Congress Ave., Ste. 1800
>       Austin, Texas 78701

by United States certified mail-return receipt requested, and by United States first class mail, postage prepaid, and by e-mail to Mark C. Taylor, mark.taylor@wallerlaw.com, AND Allan Reagan, alr78681@gmail.com

The Debtor shall have thirty (30) days from the earlier to occur of: (i) the date of receipt of the written notice sent by certified mail, or (ii) the date of receipt of the written notice sent by first class mail to cure the default (For the purposes of the written notice by United States first class mail, postage prepaid, such notice will be deemed received five (5) days after depositing the same in the United States mail). In the event the Debtor does not cure the default within the thirty (30) day period provided herein, the affected Creditor or Interest Holder shall be entitled to pursue its state and/or federal law remedies – as limited by the Plan – without further notice or hearing before the Court.

12.02.   The Debtor must remain current with respect to all post-petition federal tax liability, including but not limited to making timely federal tax deposits, the timely filing of tax returns and the payment of all tax liabilities as required by applicable law during the term of the Plan. Failure to remain current with respect to one or more post-petition federal tax liabilities shall constitute an event of default under of the plan; however, the Bankruptcy Court shall have no jurisdiction over any tax issues arising after the date of confirmation. There will be no automatic stay or post-confirmation injunction with regard to federal tax liabilities accrued after the petition date, and the IRS shall be free to collect any such liabilities in accordance with the provisions of Title 26 of the United States Code and other applicable law.

12.03.   Upon any final and non-curable default of the Plan by Debtor, a Creditor may accelerate its allowed prepetition and post-petition claims, and any future administrative claims, and declare the outstanding amounts of such claims to be immediately due and owing and pursue any and all available state and federal rights and remedies as provided by law without further order of this Court.

12.04.  In the event the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), the following default provisions shall apply: Pursuant to 11 U.S.C. § 1191(c)(3), in the event that payments are not made by the Debtor as required by the Plan and Confirmation Order, creditors and parties-in-interest shall have the right to seek dismissal or conversion of the Bankruptcy Case. Creditors holding liens against particular assets of the Debtor shall also have the right to file a motion for relief from the automatic stay. The Bankruptcy Court shall retain jurisdiction to determine all matters related to enforcement of the Plan and Confirmation Order.

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

By: _/s/ Mark C. Taylor_____
      Mark C. Taylor
      State Bar No. 19713225
      William R. "Trip" Nix
      State Bar No. 24092902
      100 Congress Avenue, Suite 1800
      Austin, Texas 78701
      (512) 685-6400
      (512) 685-6417 (FAX)
      mark.taylor@wallerlaw.com
      trip.nix@wallerlaw.com

ATTORNEY FOR DEBTOR

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the parties listed below electronically via the Court's ECF system and on all persons on the attached service list on March 9, 2021.

**Debtor**
Allan L. Reagan
2000 S. IH−35, Suite Q11
Round Rock, TX 78681−6942

**Trustee (*via ECF*)**
Michael Colvard
Weston Center
112 East Pecan Street, Suite 1616
San Antonio, TX 78205

**U.S. Trustee (*via ECF*)**
United States Trustee
903 San Jacinto, Room 322
Austin, TX 78701

*/s/ Mark C. Taylor*
Mark C. Taylor

# SERVICE LIST

**Debtor**
Allan L. Reagan
585 River Run
Leander, TX 78641

**Trustee**
Michael Colvard
Weston Center
112 East Pecan Street, Suite 1616
San Antonio, TX 78205

**Twenty-largest creditors:**
Madison/East Towne LLC
c/o CBL & Associates
2030 Hamilton Place Blvd.
Chattanooga, TN 37421-6000

Village @ La Orilla
Attn: Philip Lindborg
12809 Donette Court N.E.
Albuquerque, NM 87112

Martin S. Headley
1500 Knobb Hill Lane
Paoli, PA 19301

Comerica Bank
Attn: Lesley B. Higginbotham, VP
Special Assets Group - Texas Market
P.O. Box 650282
Dallas, TX 75265-0282

Ann E. Headley
1500 Knobb Hill Lane
Paoli, PA 19301

Wyndham Franchisor LLC
22 Sylvan Way
Parssipany, NJ 07054

Spain Family IX LLC
c/o Patrick J. Spain
11809 Oak Branch Dr.
Austin, TX 78737

Bennett Living Trust
Attn: Michael Bennett
2321 Abbot Kinney Blvd.
Venice, CA 90291

Gary J. Neumayer
2201 Berrywood Lane
Bloomington, IL 61704-2449

Headley Investments, LP
1500 Knobb Hill Lane
Paoli, PA 19301

Frances and Wayne Lee
468 Jade Tree Lane
Monterey Park, CA 91754

Capital One Spark Visa for Business
P.O. Box 30285
Salt Lake City, UT 84130-0285

Chase Ink Card for Business
P.O. Box 15298
Wilmington, DE 19850-5298

Ford Motor Credit Corp.
P.O. Box 105704
Atlanta, GA 30348

Comerica Bank
Dept. #166901
P.O. Box 55000
Detroit, MI 48255-1669

Citicard Advantage Mastercard
Cardmember Services
P.O. Box 6062
Sioux Falls, SD 57117

Discover Card
Billing Inquiries
P.O. Box 30943
Salt Lake City, UT 84130

Chase Visa Mileage Plus
P.O. Box 15298
Wilmington, DE 19850-5298

Comerica Bank
Attn: J.B. Stueckler, AVP
300 W. Sixth Street
Austin, TX 78701

**Unsecured Creditors/**
**Interested Parties**
3401Hoteliers, LP
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

83rd Street Development, LLC
Attn: Trent G. Moore
9000 Cameron Parkway
Oklahoma City, OK 73114

Action Propane
2601 S. Hwy. 183
Leander, TX 78641

ADT
P.O. Box 660418
Dallas, TX 75266

Al Clawson Disposal
P.O. Box 416
Jarrel, TX 76537

AT&T
P.O. Box 5001
Carol Stream, IL 60197

AT&T (DirectTV)
P.O. Box 5014
Carol Stream, IL 60197

Bank of Austin
Attn: David H. Marks, SVP
8611 N. Mopac Exp., Suite 101
Austin, TX 78759

DT Chandler, LLC
Attn: Bret Anderson, Manager
140 E. Rio Salado Parkway, Unit 305
Tempe, AZ 85281

FB Capital, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse AZ, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse Holdco, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse Indiana, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse Iowa, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse NM, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse OK, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse SAT, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse III, LLC (Mansfield)
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse Texas IV, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse Texas V, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse TX II, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse TX IV, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse Wi, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Brewhouse, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Flix Entertainment, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Hospitality Investors, Inc.
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Internal Revenue Services
Centralized Insolvency Office
P.O. Box 7346
Philadelphia, PA 19101-7346

Janet L. Reagan
585 River Run
Leander, TX 78641

Kathleen R. McCormick
6801 Greenwood Ave., Unit 210
Seattle, WA 98103

Lone Star National Bank
Attn: Sergio Gonzalez, 1st VP
2100 Boca Chica Blvd.
Brownsville, TX 78520

Merle Hay Investors LLC
c/o Abbell Credit Corporation
30 N. LaSalle St., Suite 2120
Chicago, IL 60602

Mikeska Monahan & Peckham, P.C.
100 Congress Ave., Suite 990
Austin, TX 78701

Pedernales Electric Company
P.O. Box 1
Johnson City, TX 78636

Poolwerx by Blue Bottom Pool Supply
3021 S. IH35, Suite 140
Round Rock, TX 78664

Prudential Mortgage Capital Company LLC
c/o Prudential
100 Mulberry St., Gateway Center 4
8th Floor
Newark, NJ 07102

ROP Artcraft LLC
Attn: Adam Frank
5678 N. mesa St.
El Paso, TX 79912

Round Rock Business Park, LLC
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

RPT Realty, L.P.
19 W. 44th Street, Suite 1002
New York, NY 10036

Securian/Minnesota Life Insurance Co.
c/o Trinity Real Estate Finance
100 NE Loop 410, Suite 972
San Antonio, TX 78216

Southwestern Retail Properties II, LP
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Southwestern Retail Properties III, LP
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Southwestern Retail Properties LP
Attn: Allan Reagan
2000 S. IH-35, Suite Q11
Round Rock, TX 78681

Spectrum
P.O. Box 60074
City of Industry, CA 91716-0074

UBS Real Estate Securities, Inc.
c/o Berkadia Commercial Mortgage LLC
6955 Union Park Center, Suite 450
Midvale, UT 84047

U.S. Trustee
903 San Jacinto, Suite 230
Austin, TX 78701

Wells Fargo Auto
MAC T9017-026
P.O. Box 168-48
Irving, TX 75016-8048

Williamson County Tax Office
904 S. Main Street
Georgetown, TX 78626

**Parties Filing Claims**
Discover Bank/Discover Products
PO Box 3025
New Albany, OH 43054-3025

JPMorgan Chase Bank, N.A.
c/o National Bankruptcy Services LLC
P.O. Box 9013
Addison, TX 75001

Capital One Bank (USA) N.A.
By American InfoSource as agent
4515 N. Santa Fe Ave.
Oklahoma City, OK 73118

Madison/East Towne, LLC
Attn: Caleb T. Holzaepfel
736 Georgia Ave., Ste. 300
Chattanooga, TN 37402

**Parties Requesting Notice**
Stephen G. Wilcox
Wilcox Law, PLLC
P.O. Box 201849
Arlington, TX 76006

Shane P. Tobin
Henry G. Hobbs, Jr.
Acting United States Trustee
903 San Jacinto Blvd., Room 230
Austin, TX 78701

Kell C. Mercer
Kell C. Mercer, P.C.
1602 E. Cesar Chavez Street
Austin, TX 78702

Robert J. Diehl, Jr.
Jaimee L. Witten
Noel J. Ravenscroft
Bodman PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, MI 48226

Bruce J. Zabarauskas
Thompson & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201

Michael Flume
Flume Law Firm, LLP
1020 N.E. Loop 410, Suite 530
San Antonio, TX 78209

David M. Blau
Clark Hill PLC
151 S. Old Woodward Ave., Suite 200
Birmingham, MI 48009

Ross A. Plourde
McAfee & Taft
211 North Robinson, 8th Floor
Oklahoma City, OK 73102-7103

Harrel L. Davis III
Gordon Davis Johnson & Shane P.C.
4695 N. Mesa Street
El Paso, TX 79912

Daniel M. Eliades
K&L Gates, LLP
One Newark Center, Tenth Floor
1085 Raymond Boulevard
Newark, New Jersey 07102

David Catuogno
K&L Gates, LLP
One Newark Center, Tenth Floor
1085 Raymond Boulevard
Newark, New Jersey 07102

Caitlin C. Conklin
K&L Gates, LLP
One Newark Center, Tenth Floor
1085 Raymond Boulevard
Newark, New Jersey 07102

Jack O'Connor
Sugar Felsenthal Grais & Helsinger LLP
30 N. LaSalle St., Suite 3000
Chicago, IL 60602

William T. Peckham
1104 Nueces St., Suite 104
Austin, TX 78701-2106

Stephen K. Lecholop II
Rosenthal Pauerstein
Sandoloski Agather LLP
755 East Mulberry, Suite 200
San Antonio, TX 78212

Peter Lindborg
550 N. Brand Blvd., Suite 1830
Glendale, CA 91203

Louis D. Lopez
Fennemore Craig, P.C.
2394 E. Camelback Rd., Suite 600
Phoenix, AZ 85016

Richard E. Hettinger
Davidson Troilo Ream & Garza, P.C.
601 N.W. Loop 410, Suite 100
San Antonio, Texas 78216

038540-04298/4839-4773-4992.1

# EXHIBIT A

**FINANCIAL PROJECTIONS**

### A. Introduction

The Debtor has prepared the financial projections herein (the "Financial Projections"), reflecting the Debtor's estimate of the future disposable income over the next five years, from April 1, 2021 through March 31, 2026 (the "Projection Period"). For the purposes of the Financial Projections, the Effective Date is assumed to be March 31, 2021 (the "Assumed Effective Date"). These Financial Projections were prepared and are current through January 20, 2021 (the "Plan Date"). The calculations have been revised to correct a formula error in the Excel spreadsheet.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successors under the Plan.

The Financial Projections reflect the Debtor's judgment of expected employment and future operating and business conditions, which are subject to change, of the operating businesses in which the Debtor has an economic interest. Although the Debtor has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtor can provide no assurance that such assumptions will be realized. The Financial Projections have not been audited or reviewed by independent accountants.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING, BUT NOT LIMITED TO, THE IMPLEMENTATION OF THE PLAN, IMPACTS OF THE GLOBAL COVID-19 PANDEMIC, ACHIEVING OPERATING FORECASTS, INDUSTRY-SPECIFIC RISK FACTORS, PARTICULARLY WITH RESPECT TO THE MOVIE EXHIBITION BUSINESS IN THE UNITED STATES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTOR'S CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

**FINANCIAL PROJECTIONS**

**B.  Assumptions**

    **a.  Methodology & Limitations**

    **Dependence on Assumptions -** The Financial Projections depend on a number of estimates and assumptions. Although developed and considered reasonable by the Debtor, the management of the underlying entities, and the Debtor's professionals, the assumptions are inherently subject to significant economic, business, regulatory, public health, and competitive uncertainties and contingencies beyond the control of the Debtor. Accordingly, actual results could vary materially and adversely from those contained herein.

    **Assumed Effective Date –** For the purposes of the Financial Projections, the Effective Date of the Debtor's Plan of Reorganization is assumed to be March 31, 2021.

    **Projection Period –** The Debtor has projected five years of disposable income, from April 1, 2021 through March 31, 2026. In the Financial Projections, the five-year Projection Period is shown by year with Year 1 being the twelve-month period of April 1, 2021 through March 31, 2022.

    **Disposable Income –** Disposable income includes the Debtor's income from wages, interest, dividends, and distributions less tax withholdings, retirement savings, healthcare premiums, the Debtor's and his spouse's reasonable living expenses, and payments necessary for the continuation, preservation or operation of the Debtor's business. The Debtor projects to receive a return of capital from certain investments during the Projection Period. In the Financial Projections, the Debtor included the realized capital gains associated with these investments in the Disposable Income while the returned capital is assumed to be reinvested at the same yield, generating additional interest income to be included in the Debtor's income in subsequent periods.

    The Debtor has included financial projections for certain underlying businesses that he controls and from which he anticipates receiving distributions during the Projection Period. The financial projections for these entities include projected income statement and levered cash flow projections.

    **Division of Community Property –** The Financial Projections contemplate the Debtor's gross income is used to pay for reasonable living expenses of the Debtor and his spouse. Income derived from community property, including but not limited to dividends from publicly traded stocks and distributions from interests in limited liability companies, are included in their full gross amounts in the calculation of the Debtor's Disposable Income. Proceeds from asset sales, net of any liquidation costs, are divided, pursuant to applicable Texas law, between the Debtor's Bankruptcy Estate, and included in the Debtor's estimate of disposable income, and the Debtor's spouse.

**C.  Notes on the Financial Projections**

    **1.  Income:** The Debtor projects income from various sources over the Projection Period, including:

        **a.  Wages:** Historically, the Debtor has received a salary from Aramcor Inc. ranging between $90,000 and $100,000 annually, and Aramcor has recovered that expense via fee billings to its clients, including Flix Entertainment LLC ("Flix"). For a portion of

**FINANCIAL PROJECTIONS**

the Paycheck Protection Program forgiveness period in 2020, Debtor went on the payroll of Flix because that entity was not able to fully utilize forgivable funds and was also challenged paying management fees. In evaluating his personal services in the context of the Plan, which contemplates an exceedingly challenging concurrent rehabilitation of Flix, the Debtor reasonably projects 2021 wages of $140,000. Due to the financial distress caused by the COVID-19 pandemic, the Debtor is not currently receiving a salary from Flix nor is Aramcor collecting management fees. Due to the government support enacted in December 2020, the Debtor anticipates Flix will be able to resume paying the Debtor a salary for the Plan Year beginning April 2021. The Debtor forecasts aggregate gross wages of $50,000 from Aramcor and $90,000 from Flix in Year 1 with 2% annual raises in each subsequent year of the Projection Period. It should be noted that CEO compensation is subject to advance approval by the Flix Board of Managers which while probable, cannot be guaranteed.

The Financial Projections incorporate three reductions to the Debtor's gross wages, including 17.5% tax withholding, $24,000 annual retirement savings contributions (same as 2020), and healthcare premiums, which the Debtor projects to increase 5% per year during the Projection Period.

**b.** **Asset Sales:** The Financial Projections include the sale of approximately $225,000 of publicly traded stocks shortly after the Effective Date. As discussed above and in the Plan, the proceeds of these asset sales, after 50% division of community property, are included in the projected funds for Year One distribution to creditors.

**c.** **Dividends and Interest:** The Debtor receives dividends and interest from his holdings of cash, publicly traded stocks, mutual funds, and exchange-traded funds. Distributions and interest in Year 1 are projected based upon the current dividend yield or interest rate of the underlying holdings. No growth in dividends or interest over the Projection Period is projected. Interest expense charged by Interactive Brokers on the Debtor's margin loan is deducted from gross dividend income.

**d.** **Distributions**

- **Round Rock Business Park, LP:** The Debtor receives pro-rata share of distributions from his partnership interests in Round Rock Business Park, LP ("RRBP") and ARPROP, Inc ("ARPROP"), the general partner of RRBP and 1% equity holder in RRBP. The Debtor's community interest owns 78.63% of RRBP and 100% of ARPROP.

RRBP is the owner of Park West Corporate Center ("PWCC"), a 118,000 square-foot business park in Round Rock, Texas. Currently, PWCC's leasable space is approximately 95% occupied, which is at or above the local market average. PWCC has performed steadily over recent years and has held up well during the pandemic. However, a slight decrease in occupancy is forecasted in Year 1 and Year 2 to reflect uncertainty of upcoming tenant renewals in light of the challenging business environment stemming from the pandemic. The Financial Projections incorporate the following assumptions into the financial performance of RRBP during the Projection Period:

**FINANCIAL PROJECTIONS**

- Occupancy is projected to decrease in Year 1 and Year 2 from 94% to 90% but rebound to 93% in Year 3 through Year 5.

- Tenant Improvement / Capital Expenditures of $125,000 per year are included during the Plan Projections to remodel office space to suit new tenants.

- RRBP is the largest shareholder of Southwestern Retail Properties III, LP ("SRP3"). RRBP has been providing liquidity support to SRP3 during the pandemic while the sole tenant of SRP3's real estate property, San Antonio Flix Brewhouse, is not operating. The Financial Projections contemplate RRBP advances funds to Southwestern Retail Properties III, LP ("SRP3") to make its loan payments for six months during Year 1. No distributions or upstreamed funds from SRP3 to RRBP are included in the Financial Projections.

- **Southwestern Retail Properties, LP:** The Debtor receives a pro-rata share of distributions from partnership interests in Southwestern Retail Properties, LP ("SRPLP") and Southwestern Retail Properties, GP ("SRPGP"), the general partner of and 1% equity holder in SRPLP. The Debtor's community interest owns 46.24% of SRPLP and 100% of SRPGP.

SRPLP owns Sky Ridge Plaza (Lots 1 and 5, "SRP"), a 141,000 square-foot retail center in Round Rock, Texas built in 1987. SRP is currently approximately 74% occupied, which reflects the challenging operating environment facing many retail and restaurant businesses during the pandemic.

The Financial Projections incorporate the following assumptions into the financial performance of SRPLP during the Projection Period:

- Occupancy is projected to decline in Year 1 to 70% and then rebound over the subsequent years to 85% by Year 5.
- SRPLP refinances the existing mortgage on SRP in 2022 at the same monthly payments.
- $150,000 of tenant improvements per year are included in the projections to attract new tenants.
- Construction and fit-out of CLIKworks, co-working and contemporary executive suites in a currently vacant space, resumes in late February 2021, and the first members move in during June 2021. Because of the cost of CLIKworks as well as other re-tenanting efforts, distributions from SRPLP are not projected to resume until Year Two of the Projection Period (April 1, 2022 to March 31, 2023).

**FINANCIAL PROJECTIONS**

- **Flix Entertainment LLC, its subsidiaries, and related entities[1]:** The Debtor projects that no distributions will be made from Flix Entertainment LLC and its related and affiliated entities ("Flix") during the Projection Period. The Debtor is the founder and CEO of the Flix entities. As of the date of this Plan, two-thirds of the movie theaters in the USA are not open for business due to the devastating impact of the pandemic, and of those that are open, year-over-year revenue decreases of 70-90% are typical. Flix is no exception and has suspended operations for its 10 completed dine-in cinemas[2] since mid-March 2020, except for 6-12 weeks of unsuccessful operations from late August through early November 2020.

  In addition to the immediate devastating decreases in attendance, the pandemic has triggered a seismic shift in both consumer moviegoing habits and film distribution practices, with significantly more product moving to in-home consumption and the window of exclusivity for movies shown in theaters decreasing from a pre-pandemic norm of 84 days to a new norm of zero to 17 days.

  The Debtor is working with Flix's advisors to restructure of the group's obligations, which is likely to include a mix of store closings, asset sales, lease renegotiations and recapitalization of selected theater entities from government grants. The Debtor anticipates that the selected theater entities will receive funds through governmental support programs. Subject to lease renegotiations, the federal aid will allow at least half of the Flix theaters to resume operations and withstand substantial expected negative cash flow associated with reopening and rebuilding a revenue base. Reopenings are currently projected by Flix as a series of rolling re-starts from late May to mid-summer 2021.

  However, because of the uncertainty involving Flix, Debtor's status as an Insider, and the likely subordination of claims held by the Debtor against Flix to that of other allowed claims of creditors of Flix, no future return on investment from the Debtor's equity interests in or note receivable due from Flix are shown in the Financial Projections.

- **Prairie Point Estates, Inc.:** Prairie Point Estates, Inc ("PPEI") is in the beginning stages of developing approximately 242 acres of raw land into an equestrian-themed midscale residential acreage subdivision in Bertram, Texas. PPEI's equity capitalization consists of $360,000 paid in by Debtor pre-petition, and $90,000 cash contributed by PPEI's president. PPEI projects sales of improved lots will begin in late 2021 to early 2022 and conclude in 2024.

---

[1] Related entities include Woodward Center Inc., FB Capital LLC, Hospitality Investors, Inc., Southwestern Retail Properties II LP, and Southwestern Retail Properties III LP. The Debtor does not project to receive any distributions from these entities during the Projection Period.

[2] An 11th theater was under construction when the pandemic was declared, and subsequently the landlord tendered possession to Flix to complete construction and fit-out. Although Debtor as Flix CEO desires to complete it and open for business, the ultimate disposition of this 75% completed project is unknown,

**FINANCIAL PROJECTIONS**

Ninety-six percent (233 acres) of this raw land had been owned by RRBP since 1996. PPEI acquired the balance in August 2019. Although just 4% of the land area, the 2019 PPEI acquisition represents 97.5% of the street frontage. RRBP sold its land to PPEI on November 30, 2020 for gross consideration of $1,465,000, of which $1,175,000 represented seller financing in the former of a payment-in-kind promissory note (the "PIK Note") and the balance in cash. RRBP made an immediate distribution of the sales proceeds to its partners, of which the PIK Note was distributed to and in the name of the Debtor, and other RRBP partners received cash. The PIK Note now held by the Debtor accrues unpaid interest at the annual rate of 6% for the first two years and 8% thereafter.

PPEI is indebted to a related party, 100 Trinity LLC, for a total of $500,000 in connection with the financing of land acquisitions. This indebtedness bears interest payable quarterly at the Wall Street Journal Prime Rate plus 100 basis points and is secured by a first lien on all the real estate and improvements. 100 Trinity and PPEI have entered into a term sheet calling for a total of up to $1.5 million in additional project financing to fund subdivision development costs.

In Plan Year 4, the PIK Note is projected to be repaid together with accrued interest. This income, and the capital gains from the Debtor's equity investment have been included in the Debtor's income in the Financial Projections. The Financial Projections also contemplate reinvestment of the PPEI "capital stack" (first mortgage loan, PIK Note principal and the original paid-in capital) at their existing yields for the remaining duration of the Plan.

- **100 Trinity LLC:** 100 Trinity LLC ("Trinity") makes opportunistic loans and investments in both public and private companies. Trinity generates income from two sources: (i) dividends from publicly traded stocks, mutual funds, and exchange traded funds and (ii) interest from cash holdings and loans to individuals and businesses.

In the Financial Projections, the Debtor projects dividend income based upon the dividend yield of the current holdings. No changes in dividend income are projected.

Trinity has previously loaned $500,000 to PPEI pursuant to a first mortgage credit agreement. Trinity has also committed to fund up to an additional high credit of $1,325,000[3] to PPEI subject to certain entitlement milestones and performance metrics. The Financial Projections assume that Trinity funds an additional $750,000 loan in Year 1 through cash on hand and the liquidation of its holdings of GLD, which does not produce any income. PPEI is projected to repay the loan from Trinity, with interest, in 2023. The Financial Projections assumes Trinity reinvests the repaid loan proceeds at the same yield.

Trinity also holds a note receivable in the amount of $100,000 due from a former Senior Vice President of Flix. No receipts or income are included in the Financial

---

[3] Maximum additional of $1,575,000 in extenuating circumstances then subject to Trinity's discretionary approval

**FINANCIAL PROJECTIONS**

Projections due to disputes surrounding unpaid severance and the limited value of the collateral, the former employee's then vested equity options.

- **3401 Hoteliers LP:** 3401 Hoteliers LP ("Hoteliers") is an entity that operated a Wyndham Garden hotel in Austin, Texas, subject to a ground lease and a first mortgage on the improvements, both of which are in default. Operations of the hotel ceased in October 2020 and a court-appointed receiver now manages the closed hotel and associated real estate. While the underlying asset is subject to a letter of intent for purchase, subject to the ability to assume Hoteliers' loan and cure its defaults, the Debtor does not believe that any value remains for the equity of this entity because Hoteliers has substantial secured and unsecured debts. Accordingly, no income has been projected from the Debtor's interest in this asset in the Financial Projections.

- **Aramcor Inc:** Aramcor Inc. ("Aramcor") is a management services organization with approximately 10 employees, including the Debtor, who provide various accounting, property management and executive services to operating affiliates. Aramcor has three main revenue streams: (a) property management fees, typically as a percentage of revenues ranging for 2.7% to 4.5%; (b) leasing incentive fees in excess of commissions paid; and (c) full cost recovery based on hourly billing rates. In addition, Aramcor receives fees for entity management such as investor relations, tax return preparation and coordination, corporate accounting services, and entity compliance.

  In 2019, the majority of Aramcor's revenues were derived as a percentage of revenues earned from Hoteliers and a flat monthly rate charged to Flix. By far, Hoteliers was its most profitable account. As a result of the pandemic's impact on Hoteliers and Flix, Aramcor's revenues have been severely impacted and it has incurred starkly negative operating income. Aramcor obtained a fully-forgivable PPP loan as well as a $150,000 Economic Injury Disaster Loan which is subject to regular repayments during the Projection Period.

  Given the uncertainty of the future outcome for Flix and the cessation of operations at Hoteliers, the Financial Projections assume the Debtor's continued employment, but no excess cash flow.

- **Other Minority, Non-Controlling Investments[4]:** The Debtor holds various investments in third-party controlled businesses and investment funds. These are primarily early-stage non-public enterprises that do not pay dividends and are held for long-term capital appreciation. One investment is a merger arbitrage hedge fund. Because of the lack of regular income and uncertainty of final outcome, Debtor does not forecast any income from these investments during the Projection Period.

---

[4] Includes investments in Nineteen77 Global Merger Arbitrage LLC, Select Access 2 Liquidation LLC, Newser LLC, First Stop Health, LLC, and Luft Hefe LLC.

**FINANCIAL PROJECTIONS**

    **e.**  **Reimbursements:** The Debtor maintains a family plan from AT&T for cellular phone service for several family members. The Debtor pays the phone bill directly to AT&T and is reimbursed by family members for their portion of the bills.

**2.**  **Living Expenses:**

    **a.**  **Car Payments:** Two car loans are reaffirmed and payments continued in the ordinary course.

    **b.**  **Inflation:** The Financial Projections incorporate an assumed 2% annual increase in the Debtor's living expenses to reflect general inflation, except for property taxes, which are forecasted to increase by 5% per annum and the car payments, which will remain the same over the Projection Period per the financing agreements.

**3.**  **Federal Income Taxes:** NOLs are carried forward and applied to offset income during the Projection Period. The Debtor estimates no federal income taxes, in excess of the tax withholdings from his paychecks, will be due during Year 1 through Year 3 in the Financial Projections, as it is estimated Net Operating Losses generated in 2020 and earlier will be carried forward and applied to future income tax liabilities. The short sale or deed in lieu of foreclosure of the Wyndham Garden property is projected to trigger approximately $4 million to $5 million of taxable income in 2021, partially offsetting the NOL carryforward. In Years 4 and 5, the Debtor has reserved 20% of the pass-through income from his interests in LLCs and LPs for payment of federal income taxes.

**4.**  **Chapter 11 Administrative Expenses:** Chapter 11 administrative expenses are to be paid on the Effective Date from cash on hand. As a result, no administrative expenses are included in the Financial Projections.

## FINANCIAL PROJECTIONS

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **INCOME** | | | | | |
| Gross wages | $ 140,000 | $ 142,800 | $ 145,656 | $ 148,569 | $ 151,541 |
|   Tax withholdings | (24,500) | (24,990) | (25,490) | (26,000) | (26,520) |
|   Retirement contributions | (24,000) | (24,000) | (24,000) | (24,000) | (24,000) |
|   Healthcare premiums | (6,000) | (6,300) | (6,615) | (6,946) | (7,293) |
| Net wages | 85,500 | 87,510 | 89,551 | 91,624 | 93,728 |
| Asset Sales | 114,076 | - | - | - | - |
| Dividends and Interest | 108,965 | 110,896 | 110,896 | 110,896 | 202,996 |
| Distributions | 237,383 | 524,481 | 669,844 | 1,197,665 | 807,427 |
| Reimbursements | 1,980 | 2,020 | 2,060 | 2,101 | 2,143 |
| **Total Income** | **$ 547,904** | **$ 724,906** | **$ 872,351** | **$ 1,402,286** | **$ 1,106,294** |
| **CHAPTER 11 ADMINISTRATIVE EXPENSES** | | | | | |
| Chapter 11 professionals | | | | | |
| Subchapter V Trustee | | | | | |
| Reserve for Federal Income Tax Liability | - | - | - | (290,552) | (212,454) |
| **Total Chapter 11 Administrative Expenses** | **$ -** | **$ -** | **$ -** | **$ (290,552)** | **$ (212,454)** |
| **LIVING EXPENSES** | | | | | |
|   Medical/Therapy/Prescriptions | (30,000) | (30,600) | (31,212) | (31,836) | (32,473) |
|   Food, meals, personal care items, household supplies | (24,000) | (24,480) | (24,970) | (25,469) | (25,978) |
|   Car Payments | (24,144) | (24,144) | (24,144) | (24,144) | (24,144) |
|   Vehicle Fuel & Operating Expense | (6,000) | (6,120) | (6,242) | (6,367) | (6,495) |
|   Tolls | (3,000) | (3,060) | (3,121) | (3,184) | (3,247) |
|   Property Taxes | (17,052) | (17,905) | (18,800) | (19,740) | (20,727) |
|   Household & pool maintenance, repairs, parts, HOA | (12,528) | (12,779) | (13,034) | (13,295) | (13,561) |
|   Lawn services, tree, fencing and irrigation sys. Maintenance | (12,000) | (12,240) | (12,485) | (12,734) | (12,989) |
|   Utilities | (11,760) | (11,995) | (12,235) | (12,480) | (12,729) |
|   Cell Phones | (7,200) | (7,344) | (7,491) | (7,641) | (7,794) |
|   Telephone, internet, cable, streaming services | (7,200) | (7,344) | (7,491) | (7,641) | (7,794) |
|   Clothing, laundry, and dry cleaning | (2,820) | (2,876) | (2,934) | (2,993) | (3,052) |
|   Property Insurance | (3,900) | (3,978) | (4,058) | (4,139) | (4,221) |
|   Life Insurance | (1,800) | (1,836) | (1,873) | (1,910) | (1,948) |
|   Car Insurance | (3,000) | (3,060) | (3,121) | (3,184) | (3,247) |
|   Entertainment, recreation, hobbies | (6,000) | (6,120) | (6,242) | (6,367) | (6,495) |
|   Pet Costs - Food and Vet Bills | (9,600) | (9,792) | (9,988) | (10,188) | (10,391) |
|   Gifts | (1,200) | (1,224) | (1,248) | (1,273) | (1,299) |
|   Domestic help for spouse | (12,000) | (12,240) | (12,485) | (12,734) | (12,989) |
| **Total Living Expenses** | **$ (195,204)** | **$ (199,137)** | **$ (203,174)** | **$ (207,318)** | **$ (211,574)** |
| **FUNDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | **$ 352,700** | **$ 525,770** | **$ 669,178** | **$ 904,415** | **$ 682,266** |
| **QUARTERLY PAYMENTS TO ALLOWED CLAIMS** | **$ 88,175** | **$ 131,442** | **$ 167,294** | **$ 226,104** | **$ 170,566** |

# FINANCIAL PROJECTIONS

| ROUND ROCK BUSINESS PARK, LP | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Rental Income | $ 1,492,655 | $ 1,507,582 | $ 1,573,413 | $ 1,604,881 | $ 1,636,979 |
| Other Operating Income | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Total Income | $ 1,495,655 | $ 1,510,582 | $ 1,576,413 | $ 1,607,881 | $ 1,639,979 |
| *Reimburseable Expenses* | | | | | |
| Property Taxes | 339,321 | 356,287 | 374,101 | 392,806 | 412,447 |
| Insurance | 32,146 | 32,146 | 32,146 | 32,146 | 32,146 |
| Water | 23,812 | 23,812 | 23,812 | 23,812 | 23,812 |
| Expense Reimbursement | (355,751) | (371,021) | (399,955) | (417,351) | (435,617) |
| Net Reimburseable Expenses | 39,528 | 41,225 | 30,104 | 31,414 | 32,788 |
| Electricity | 17,514 | 17,514 | 17,514 | 17,514 | 17,514 |
| Repairs & Maintenance | 135,180 | 135,180 | 135,180 | 135,180 | 135,180 |
| SG&A | 39,490 | 39,490 | 39,490 | 39,490 | 39,490 |
| Management Fees | 52,243 | 52,765 | 55,069 | 56,171 | 57,294 |
| Total Operating Expenses | 283,954 | 286,174 | 277,357 | 279,768 | 282,266 |
| **Net Operating Income** | $ 1,211,701 | $ 1,224,408 | $ 1,299,056 | $ 1,328,113 | $ 1,357,712 |
| Other Income | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Depreciation & Amortization | 212,040 | 212,040 | 212,040 | 212,040 | 212,040 |
| Bad Debt Expense | 24,331 | 14,927 | 15,076 | 15,734 | 16,049 |
| Interest Expense | 489,772 | 477,420 | 464,509 | 451,012 | 436,903 |
| **Net Income** | $ 490,558 | $ 525,021 | $ 612,431 | $ 654,327 | $ 697,721 |
| *Plus:* | | | | | |
| Depreciation & Amortization | 212,040 | 212,040 | 212,040 | 212,040 | 212,040 |
| Bad Debt Expense | 24,331 | 14,927 | 15,076 | 15,734 | 16,049 |
| Capital Expenditures | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Principal Paydown | (272,584) | (284,936) | (297,848) | (311,345) | (325,454) |
| **Operating Cash Flow** | $ 429,344 | $ 442,052 | $ 516,699 | $ 545,756 | $ 575,356 |
| Tenant Improvements | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| SRP III | (276,000) | - | - | - | - |
| Reserve for Income Taxes | - | - | - | - | - |
| **Free Cash Flow Available for Distributions** | $ 53,344 | $ 342,052 | $ 416,699 | $ 445,756 | $ 475,356 |
| Allan L Reagan (78.63%) | 41,944 | 268,955 | 327,650 | 350,498 | 373,772 |
| APROP (1.00%) | 533 | 3,421 | 4,167 | 4,458 | 4,754 |
| **TOTAL DISTRIBUTONS TO REAGAN COMMUNITY** | $ 42,478 | $ 272,376 | $ 331,817 | $ 354,956 | $ 378,526 |

# FINANCIAL PROJECTIONS

| SOUTHWESTERN RETAIL PROPERTIES, LP | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Rental Income | $ 1,384,064 | $ 1,535,887 | $ 1,694,772 | $ 1,747,734 | $ 1,860,718 |
| Other Operating Income | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Total Income | $ 1,387,064 | $ 1,538,887 | $ 1,697,772 | $ 1,750,734 | $ 1,863,718 |
| Reimburseable Expenses | | | | | |
|   Property Taxes | 497,133 | 512,047 | 527,409 | 543,231 | 559,528 |
|   Insurance | 21,185 | 21,185 | 21,185 | 21,185 | 21,185 |
|   Water | 57,905 | 57,905 | 57,905 | 57,905 | 57,905 |
|     Expense Reimbursement | (403,356) | (443,352) | (485,198) | (513,414) | (542,825) |
| Net Reimburseable Expenses | 172,867 | 147,784 | 121,300 | 108,906 | 95,793 |
| Electricity | 8,995 | 8,995 | 8,995 | 8,995 | 8,995 |
| Repairs & Maintenance | 142,264 | 142,264 | 142,264 | 142,264 | 142,264 |
| Tenant Improvements | - | - | - | - | - |
| CLIKworks Operating Expenses | - | - | - | - | - |
| SG&A | 18,565 | 18,936 | 19,315 | 19,701 | 20,095 |
| Management Fees | 55,363 | 61,435 | 67,791 | 69,909 | 74,429 |
| Total Operating Expenses | 398,053 | 379,415 | 359,665 | 349,776 | 341,576 |
| **Net Operating Income** | $ 989,010 | $ 1,159,472 | $ 1,338,107 | $ 1,400,958 | $ 1,522,143 |
| Other Income | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Depreciation & Amortization | 212,040 | 212,040 | 212,040 | 212,040 | 212,040 |
| Bad Debt Expense | 48,223 | 27,681 | 30,718 | 33,895 | 34,955 |
| Interest Expense | 587,591 | 571,896 | 555,422 | 538,129 | 519,977 |
| **Net Income** | $ 146,157 | $ 352,854 | $ 544,928 | $ 621,893 | $ 760,171 |
| *Plus:* | | | | | |
|   Depreciation & Amortization | 212,040 | 212,040 | 212,040 | 212,040 | 212,040 |
|   Capital Expenditures | (75,000) | (100,000) | (100,000) | (100,000) | (100,000) |
|   Principal Paydown | (315,799) | (331,493) | (347,968) | (365,261) | (383,413) |
| **Operating Cash Flow** | $ (32,602) | $ 133,401 | $ 309,000 | $ 368,673 | $ 488,798 |
|   Tenant Improvements | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
|   Financing / Other Cash uses | - | - | - | - | - |
| **Free Cash Flow Available for Distributions** | $ (82,602) | $ 83,401 | $ 259,000 | $ 318,673 | $ 438,798 |
| Allan L Reagan (46.24%) | - | 38,565 | 119,762 | 147,354 | 202,900 |
| Southwestern Retail Properties, GP (1.00%) | - | 834 | 2,590 | 3,187 | 4,388 |
| **TOTAL DISTRIBUTONS TO REAGAN COMMUNITY** | $ - | $ 39,399 | $ 122,352 | $ 150,541 | $ 207,288 |

**FINANCIAL PROJECTIONS**

| 100 TRINITY LLC | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Interest | $ 2,200 | $ - | $ - | $ - | $ - |
| Dividends | 159,214 | 159,214 | 159,214 | 159,214 | 159,214 |
| Notes Receivable | 43,750 | 64,688 | 67,813 | 70,938 | 74,063 |
| **Total Income Available for Distributions** | **$ 205,163** | **$ 223,901** | **$ 227,026** | **$ 230,151** | **$ 233,276** |
| Allan L Reagan (95%) | 194,905 | 212,706 | 215,675 | 218,644 | 221,613 |
| **TOTAL DISTRIBUTONS TO REAGAN COMMUNITY** | **$ 194,905** | **$ 212,706** | **$ 215,675** | **$ 218,644** | **$ 221,613** |

# EXHIBIT B

LIQUIDATION ANALYSIS

### A.  Introduction

**NOTHING CONTAINED IN THE FOLLOWING LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTOR. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THESE CASES COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

### B.  Assumptions

#### a.  Methodology & Limitations

**Dependence on Assumptions -** The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the Debtor and the Debtor's professionals, the assumptions are inherently subject to significant economic, business, regulatory, public health, and competitive uncertainties and contingencies beyond the control of the Debtor. The Liquidation Analysis is also based on the Debtor's best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtor is, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

**Conversion Date –** Liquidation Analysis assumes a Conversion Date of March 31, 2021.

**Chapter 7 Liquidation Costs –** The fees and operating expenses incurred during the chapter 7 process are included in the estimate of Chapter 7 Administrative Claims and chapter 7 trustee professional expenses. In addition, there are liquidation costs associated with most of the Debtor's assets. Costs of liquidation are displayed as a reduction to gross liquidation proceeds.

**Division of Community Property –** Liquidation Analysis assumes the net proceeds of community property is divided between the Debtor and his spouse prior to being made available for distribution to the Debtor's creditors. For the avoidance of doubt, all of the Debtor's assets are considered community assets and the amounts listed in the Assets section of the Liquidation Analysis represent the Debtor's 50% interest in community assets.

### C.  Notes on the Liquidation Analysis

1. **Cash on Hand:** Estimated cash on hand as of the Conversion Date includes petty cash and cash in the Debtor's bank accounts, less outstanding checks.

2. **Vehicles:** The Debtor and his spouse own two cars and two trailers. Two of the cars, a 2020 Ford F-250 and a 2020 Ford Explorer were both financed by the Debtor and his spouse and are pledged as collateral for associated loans. In this Liquidation Analysis, it is

assumed that the financed vehicles are sold and proceeds utilized to pay off the associated loans first. Given the amount of financing, it is unlikely that the Debtor has any equity in these two cars.

3. **Marketable Securities:** The Debtor has brokerage accounts at Interactive Brokers and Ameriprise that hold various publicly traded equities, mutual funds, and exchange traded funds as well as cash. The Liquidation Analysis assumes a low and high recovery, representing the potential fluctuations in the public equity markets. In the low scenario, the securities are sold at 95% of the closing price as of February 12, 2021. In the high scenario, the securities are sold at 105% of the closing price as of February 12, 2021. Proceeds of the sale of these securities are used to repay the Debtor's margin loan from Interactive Brokers. Remaining funds are then split pursuant to the interest in community property. [Changes included in this amended plan represent fluctuations in market prices of the securities.]

4. **Investments in and related to Flix Entertainment LLC[1]:** The Debtor holds both direct and indirect (through feeder funds) interests in Flix Entertainment LLC a Texas limited liability company and various related entities and affiliates (together "Flix"), and presently serves as its Board Chair and CEO. Doing business as "Flix Brewhouse," through various affiliates and subsidiaries, Texas-based Flix operates ten dine-in cinemas that offer its own craft beers. An eleventh location was indefinitely postponed construction in March. Flix has been hard hit by the COVID-19 pandemic and has largely suspended operations during much of 2020. Although Flix anticipates additional governmental grants through the Save Our Screens program, there is continued uncertainty about future consumer demand for theatrical movies after the pandemic subsides. Flix is in default of all of its debt and lease obligations. Due to uncertainty of future financial performance and the current financial distress of Flix and its various subsidiaries and affiliates, no value has been ascribed to the Debtor's equity interests in Flix in the Liquidation Analysis.

5. **Investments in Texas LLC and LP entities:** The Debtor owns interests in several limited liability companies ("LLCs") and limited partnerships ("LPs") in addition to his direct and indirect investments in Flix Entertainment LLC. In a liquidation, the Trustee would, at most, be entitled to the economic benefits that would flow to a member or partner. Similarly, under Texas law, the exclusive remedy for a creditor of an individual who is a member or partner of an LLC or LP is a charging order against the individual's membership or partnership interest, directing all distributions owed to the individual to be paid to the individual's creditors (i.e. the holder of the charging order).

In the Liquidation Analysis, it is assumed a Chapter 7 trustee is able to obtain a charging order associated with the Debtor's interests or otherwise obtain the benefit of the economic interests (i.e. distributions or rights upon a sale, which for the purposes of this analysis are not materially different than receipts under a charging order) in the following entities after the Conversion Date. With a charging order in place, there are increased incentives for the Debtor, as a manager of the underlying businesses, to reinvest profits into the businesses,

---

[1] Related entities include Woodward Center Inc., FB Capital LLC, Hospitality Investors, Inc., Southwestern Retail Properties II LP, and Southwestern Retail Properties III LP. Debtor believes his equity interests in these entities have no liquidation value.

rather than make distributions to equity. In the Liquidation Analysis, discount rates of 50% and 60% are utilized in the low and high scenario, respectively, to reflect increased uncertainty and risk of that the timing of distributions to members or partners are significantly delayed into the future:

a. **100 Trinity LLC:** This entity makes opportunistic loans and investments in both public and private securities. With a charging order in place, it is assumed that profits are reinvested in securities yielding 3.0%.

b. **Round Rock Business Park LP ("RRBP") and ARPROP Inc.:** owner and general partner of Park West Corporate Center, an office campus in Round Rock, Texas. The Liquidation Analysis utilizes the projected cash flows included in the Financial Projections and discount rates of 50% and 60% to reflect the uncertainty that management would reinvest profits rather than distribute profits to equity.

c. **Southwestern Retail Properties LP and Southwestern Retail Properties GP:** owner and general partner of Sky Ridge Plaza (lots 1 and 5), a 141,000 square-foot retail center in Round Rock, Texas. The Liquidation Analysis utilizes the projected cash flows included in the Financial Projections and discount rates of 50% and 60% to reflect the uncertainty that management would reinvest profits rather than distribute profits to equity.

6. **Equity interest in 3401 Hoteliers LP:** 3401 Hoteliers LP ("Hoteliers") is an entity that operated a Wyndham Garden hotel in Austin, Texas, subject to a ground lease and a first mortgage on the improvements, both of which are in default. Operations of the hotel ceased in October 2020 and a court-appointed receiver now manages the closed hotel and associated real estate. While the underlying asset is subject to a letter of intent for purchase, subject to the ability to assume Hoteliers' loan and cure its defaults, the Debtor does not project that any proceeds will be available for distribution to equity. Hoteliers has substantial unsecured debts, and penalty loan interest is accruing in the interim. Accordingly, no value has been attributed to this asset in the Liquidation Analysis.

7. **Equity interest in Aramcor Inc:** Aramcor Inc. is a management services organization with approximately 10 employees, including Debtor, who provide various accounting, property management and executive services to operating affiliates. Other than receivables from affiliates, the dollar majority of which are from Flix and Hoteliers, both "out of business" either temporarily or permanently, Aramcor's assets are limited to used office furniture and equipment with *de minimus* value. It also has lease liability for its office premises to Southwestern Retail Properties LP. Without its employees and Debtor's continued leadership and executive management services, and without fee-generating affiliates, Aramcor has minimal value. A sale of its used office fixed assets would not likely exceed its lease liability in liquidation. Accordingly, limited value is attributed to the Debtor's equity interest.

8. **Investments in Prairie Point Estates Inc.:** The Debtor holds two investments in Prairie Pointe Estates Inc. ("PPEI"), including an equity investment of $360,000 and $1,175,000 in the form of a subordinated PIK Note originally payable to RRBP and later distributed to Debtor. The only collateral for the PIK Note is a pledge of PPEI's equity interests. PPEI is in the beginning stages of developing approximately 242 acres of raw land into an

equestrian-themed midscale residential acreage subdivision. The Liquidation Analysis assumes development operations are halted and the raw land is sold expeditiously at a price per acre of $5,500 - $6,000 (low and high scenario, respectively). The net proceeds, after paying commissions and other liquidation costs, are then used to repay the first mortgage and then the PIK Note. At the estimated gross proceeds, no value is attributed to the Debtor's equity interest.

9. **Minority Investments in Third-party Entities:**

   a. **Nineteen77 Global Arbitrage Ltd:** The Debtor holds an interest in this Cayman Islands-based hedge fund specializing in merger arbitrage. The fund is managed by UBS O'Connor and holds a reported approximately $126 million of assets under management. The fund requires redemption requests be submitted at least 15 days prior to month end, at which time the holdings are liquidated. Proceeds are distributed approximately 30 days following the month end. Included in the Liquidation Analysis is the Debtor's holdings as of December 31, 2020.

   b. **First Stop Health, LLC:** an online and telephonic health concierge service for individuals and families that combines 24/7 expert advice and diagnosis, unique symptom and condition information, and resource locators to meet its members' minor and major, urgent and chronic, healthcare needs. This company is still in development mode but has seen increased demand for tele-health as a result of the COVID-19 pandemic. While demand of the company's services are strong, there are many competitors, including four large well-known companies. The Debtor's community property has a 1.0195% interest in this entity. Debtor has no control or influence over this entity.

   c. **Luft Hefe LLC:** the holding company of a popular brew-pub restaurant in Austin, Texas named "North By Northwest." Luft Hefe LLC ceased operations and liquidated in 2020 due to the COVID-19 global pandemic. No value is attributed to the Debtor's interest in this entity in the Liquidation Analysis.

   d. **Newser LLC:** internet news site whose editors hand-pick the best stories from hundreds of US and international sources and summarize them into sharply written, easy-to-digest news briefs. Revenues have increased significantly, and the company attained profitability on a GAAP basis in 2019. However, in recent quarters growth has stalled. Debtor has no control or influence over this entity.

   e. **Select Access 2 Liquidation LLC:** This is a "hedge fund of funds" that has been liquidating illiquid investments in its portfolio since the Great Recession. It has very few assets remaining, and Debtor has no control or influence on this entity. The fund operator sends annual statements of assumed value.

10. **Bonds and Notes Receivable**

   a. **Flix Entertainment Note Receivable:** The Debtor holds a note receivable in the original principal amount of $150,000, with a current balance of $49,174 plus accrued interest. Because of the distressed financial condition of Flix and its uncertain future,

the Debtor's status as an Insider, and the Debtor's subordination of claims against Flix to that of holders of Flix indebtedness guaranteed by Debtor, an assumed liquidation value of $0.04 - $0.08 cents on the dollar was estimated for the Estate's portion of this asset in the Liquidation Analysis.

    **b. Series H United States Savings Bond:** Series H savings bonds are redeemable at face value.

11. **Federal Income Tax Refund:** The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, P.L. 116-136, signed into law by President Donald Trump on March 27, 2020, temporarily reinstated allowed carryback periods for Net Operating Losses ("NOLs") generated in tax years 2018, 2019, and 2020. Analysis to calculate or estimate the actual value of the Debtor's tax attributes is dependent on Debtor's ability to engage the CPA firm that prepared his federal tax returns for the past five years. Said CPA firm is currently preparing an engagement letter for this assignment and is also a pre-petition creditor. Based on an oral discussion with the applicable CPA firm partner, Debtor has been advised that the CARES Act carryback when and if prepared, filed and approved by the IRS could result in a refund of as much as an estimated $700,000, limited by the amount of federal taxes paid. The Debtor's Estate would have a 50% interest in any such potential refund as the refund would be community property. For the purposes of the Liquidation Analysis, the Debtor has included a range of $200,000 to $350,000 for the Estate's interest in the refund, which incorporates the estimated cost of a CPA to restate several years of tax returns and the uncertainty in the final allowed NOL carryback amount.

12. **Administrative Expenses**

    **a. Chapter 11 Professionals:** The Debtor has included an estimate of $50,000 to $100,000 for professional fees incurred prior to the Conversion Date.

    **b. Subchapter V Trustee:** The Debtor estimates approximately $10,000 to $20,000 of fees for the Subchapter V Trustee prior to the Conversion Date.

    **c. Chapter 7 Trustee and Professionals:** Chapter 7 Trustee fees are calculated based upon 3% of available funds to distribute to creditors and administrative expenses. Additionally, the Debtor has included an estimate of $50,000 to $150,000 for professionals that would likely need to be retained to assist the Chapter 7 Trustee evaluate and liquidate the Debtor's assets, including the need to pursue a charging order related to the Debtor's interests in various LLCs and LPs.

13. **Claims**

As of this date, a total of 17 proofs of claim totaling $33,774,144.79 in unsecured claims have been filed, most of which consists of purported guaranty liability for post-petition lease acceleration claims. As the Proof of Claim deadline has not passed, it is not possible to state the amount of claims that will be filed. Additionally, the Debtor expects that a number of the claims will be subject to objection and/or estimation.

**Allan L. Reagan, Debtor**
Case #20-11161-tmd
*Liquidation Analysis*
Assumed Conversion on March 31, 2021

| *Assets (excluding exempt property):* | Notes | Estimated Liquidation Value | |
|---|---|---|---|
| | | *Low* | *High* |
| Cash | 1 | $ 155,000 | $ 165,000 |
| Vehicles | 2 | 500 | 2,000 |
| Marketable Securities | 3 | 1,104,000 | 1,257,000 |
| Investments in/related to Flix Entertainment, LLC | 4 | - | - |
| Investments in Texas LLC and LP Entities | | | |
| 100 Trinity LLC | 5a | 57,000 | 92,000 |
| Round Rock Business Park LP / ARPROP | 5b | 230,000 | 286,000 |
| Southwestern Retail Properties LP / GP | 5c | 76,000 | 101,000 |
| Investments in 3401 Hoteliers LP | 6 | - | - |
| Investments in Aramcor Inc. | 7 | - | 1,500 |
| Investments in Prairie Pointe Estates, Inc. | | | |
| PIK Note | 8 | 381,000 | 438,000 |
| Equity | 8 | - | - |
| Minority Investments in 3rd Party Entities: | | | |
| 1977 Global Merger Arbitrage LLC | 9a | 192,000 | 214,000 |
| First Stop Health, LLC | 9b | - | 25,000 |
| Luft Hefe LLC | 9c | - | - |
| Newser LLC | 9d | - | 10,000 |
| Select Access 2 Liquidation LLC | 9e | - | 2,500 |
| Bonds / Notes Receivable | | | |
| Flix Entertainment Note Receivable | 10a | 1,000 | 2,000 |
| Series H Savings Bond | 10b | 3,000 | 3,000 |
| Tax Refund | 11 | 200,000 | 350,000 |
| Life Insurance Policy | | 11,250 | 11,250 |
| Inherited IRA | | 4,820 | 4,820 |
| **Total Assets** | | **$ 2,415,570** | **$ 2,965,070** |
| | | | |
| *Administrative Expenses:* | | | |
| Chapter 11 Professionals | | 50,000 | 75,000 |
| Subchapter V Trustee | | 10,000 | 20,000 |
| Chapter 7 Trustee | | 72,467 | 88,952 |
| Chapter 7 Professionals | | 50,000 | 150,000 |
| Other Administrative Expenses | | 10,000 | 25,000 |
| **Total Administrative Expenses** | | **$ 192,467** | **$ 358,952** |
| | | | |
| **Available for Distribution to Creditors** | | **$ 2,223,103** | **$ 2,606,118** |

# FINANCIAL PROJECTIONS

**PRAIRIE POINTE ESTATES, INC.**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Gross Revenue | $ 270,000 | $ 1,804,400 | $ 1,867,554 | $ 817,773 | $ - |
| Commissions | (10,800) | (72,176) | (74,702) | (32,711) | - |
| **Net Revenue** | **$ 259,200** | **$ 1,732,224** | **$ 1,792,852** | **$ 785,062** | **$ -** |
| | | | | | |
| Planning, design and approvals | 288,450 | - | - | | - |
| Hard construction cost (including amenities) | 685,000 | 425,000 | 325,000 | | - |
| Management and overhead | 139,200 | 104,400 | 34,800 | 17,400 | - |
| Contingency | 100,000 | 60,000 | 20,000 | 13,050 | - |
| Cash Interest | 43,750 | 62,500 | 12,500 | - | - |
| **Total Project Costs** | **$ 1,256,400** | **$ 651,900** | **$ 392,300** | **$ 30,450** | **$ -** |
| | | | | | |
| **Net Project Cash Flow** | **$ (997,200)** | **$ 1,080,324** | **$ 1,400,552** | **$ 754,612** | **$ -** |
| | | | | | |
| *Financing Payments* | | | | | |
| First Mortgage (100 Trinity) | 750,000 | (1,000,000) | (250,000) | - | - |
| PIK Note - Principal (Allan Reagan) | - | - | - | (1,175,000) | - |
| PIK Note - Interest (Allan Reagan)** | - | - | - | (257,978) | - |
| Equity - Invested Capital (Allan Reagan) | - | - | - | (360,000) | - |
| Equity - Capital Gains (Allan Reagan)** | - | - | - | (215,546) | - |
| Equity - Invested Capital (Duane Davis) | - | - | - | (90,000) | - |
| Equity - Capital Gains (Duane Davis) | - | - | - | (118,956) | - |
| **Ending Cash Balance** | **$ 231,992** | **$ 312,316** | **$ 1,462,868** | **$ -** | **$ -** |

*\*\* Included in Funds Available for Distribution to Creditors*

# EXHIBIT C

| Creditor | # | Class | Amount | Amount | Class | User Class | C/U/D* | Collateral | Nature of Consideration |
|---|---|---|---|---|---|---|---|---|---|
| | | *Proof of Claim* | | | | *Scheduled* | | | |
| Ford Motor Credit Corp. | 17 | | $60,782.63 | $60,782.63 | SE | Secured | | Ford Explorer | Automobile loan |
| Wells Fargo Auto | | | | $64,679.34 | SE | Secured | | Ford F-250 | Automobile Loan |
| Interactive Brokers | | | | $1,007,526.69 | SE | Secured | | Investments | Margin Loan |
| Williamson County Tax Office | 15 | | $17,906.94 | | PR | Priority | | | Real Property Tax |
| 83rd Street Development LLC | 20 | | $2,536,460.22 | | GU | Unsecured | C/U | | Guarantee |
| Ann E. Headley | 6 | | $219,495.97 | $210,062.64 | GU | Unsecured | | | Guarantee |
| Bank of Austin | 9 | | $1,795,087.90 | | GU | Unsecured | C | | Guarantee |
| Bennett Living Trust | | | | $91,460.92 | GU | Unsecured | | | Guarantee |
| Capital One Spark Visa for Business | 8 | | $8,956.91 | $8,838.59 | GU | Unsecured | | | Credit Card |
| Chase Ink Card for Business | 3 | | $8,699.17 | $8,343.35 | GU | Unsecured | | | Credit Card |
| Chase VISA Mileage Plus | 2 | | $9,021.09 | $9,034.22 | GU | Unsecured | | | Credit Card |
| Citicard Aadvantage Mastercard | | | | $169.28 | GU | Unsecured | | | Credit Card |
| Comerica Bank | | | | $217,442.28 | GU | Unsecured | C | | Guarantee |
| Comerica Bank | | | | $3,543.70 | GU | Unsecured | | | Credit Card |
| Comerica Bank | 14 | | $5,041,966.78 | $0.00 | GU | Unsecured | C | | Guarantee |
| Discover Card | 1 | | $230.76 | $400.00 | GU | Unsecured | | | Credit Card |
| DT Chandler LLC | 13 | | $15,253,566.52 | | GU | Unsecured | C/U | | Guarantee |
| Frances and Wayne Lee | | | | $9,142.40 | GU | Unsecured | | | Guarantee |
| Gary J. Neumayer | 4 | | $36,569.57 | $36,569.57 | GU | Unsecured | | | Guarantee |
| Headley Investments LP | 7 | | $27,357.57 | $27,438.28 | GU | Unsecured | | | Guarantee |
| Kathleen R. McCormick | | | | $17,948.39 | GU | Unsecured | | | Guarantee |
| Lone Star National Bank | 19 | | $9,918,969.31 | | GU | Unsecured | C | | Guarantee |
| Madison/East Towne LLC | 12 | | $426,750.00 | $426,750.00 | GU | Unsecured | C/U/D | | Guarantee |
| Martin S. Headley | 5 | | $291,407.05 | $292,179.14 | GU | Unsecured | | | Guarantee |
| Mikeska Monahan & Peckham, P.C. | | | | $9,535.00 | GU | Unsecured | | | Services |
| ROP Artcraft LLC | 11 | | $3,750,801.80 | $0.00 | GU | Unsecured | C/U | | Guarantee |
| RPT Realty, L.P. | | | | $15,518.66 | GU | Unsecured | C/U | | Guarantee |
| Spain Family IX LLC | | | | $91,460.93 | GU | Unsecured | | | Guarantee |
| UBS Real Estate Securities Inc. | 18 | | $13,617,453.28 | | GU | Unsecured | C/U | | Guarantee |
| Village @ La Orilla | 10 | | $6,617,549.79 | $392,970.75 | GU | Unsecured | C/U/D | | Guarantee |
| Wyndham Franchisor LLC | 16 | | $207,994.34 | $199,437.44 | GU | Unsecured | | | Franchise agreement |
| TOTAL | 20 | | $59,847,027.60 | $3,201,234.20 | | | | | |

*SCHEDULED AS UNKNOWN/$0 AND DID NOT FILE PROOF OF CLAIM*

| Creditor | # | Class | Amount | Amount | Class | User Class | C/U/D* | Collateral | Nature of Consideration |
|---|---|---|---|---|---|---|---|---|---|
| Action Propane | | | | | GU | Unsecured | | | Services |
| ADT | | | | | GU | Unsecured | | | Services |
| Al Clawson Disposal | | | | | GU | Unsecured | | | Services |
| AT&T | | | | | GU | Unsecured | | | Services |
| AT&T(DirecTV) | | | | | GU | Unsecured | | | Services |
| Comerica Bank | | | | | GU | Unsecured | C | | Guarantee |
| Comerica Bank | | | | $0.00 | GU | Unsecured | C | | Guarantee |
| Flix Brewhouse Texas IV, LLC | | | | | GU | Unsecured | C/U | | Guarantee |
| GCRE/TX Main Marketplace LLC | | | | | GU | Unsecured | C/U | | Guarantee |
| Lone Star National Bank | | | | | GU | Unsecured | C | | Guarantee |
| Merle Hay Investors LLC | 21 | | $10,393,027.43 | $0.00 | GU | Unsecured | C/U | | Guarantee -- LATE FILED CLAIM |
| Pedernales Electric Company | | | | | GU | Unsecured | | | Utilities |
| Poolwerx by Blue Bottom Pool Supply | | | | | GU | Unsecured | | | Services |
| Prudential Mortgage Capital Company LLC | | | | | GU | Unsecured | C/U | | Guarantee |
| Securian/Minnesota Life Insurance Co. | | | | | GU | Unsecured | C/U | | Guarantee |
| Southwestern Retail Properties II L.P. | | | | | GU | Unsecured | C/U | | Guarantee |
| Spectrum | | | | | GU | Unsecured | | | Services |

*\* C = Contingent, U = Unliquidated, D = Disputed*